USDC- BALTIMORE
'22 MAY 19 PM 3:5[?]



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Martin J. Clarke*
*Assistant United States Attorney*
*marty.clarke@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4840*
*MAIN: 410-209-4800*
*FAX: 410-962-0716*

May 4, 2022

James M. Trusty, Esq.
A. Jeff Ifrah, Esq.
Ifrah Law
1717 Pennsylvania Avenue, N.W.
Suite 650
Washington, DC 20006

      Re:    *United States v. Philip Abramowitz*
             Criminal Case No. RDB-22-094

Dear Messrs. Ifrah and Trusty:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Philip Abramowitz (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by May 11, 2022, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

      1.    The Defendant agrees to plead guilty to the following offense charged in the Indictment: conspiracy to commit ~~wire fraud~~ [handwritten: bank fraud ajp /JMT PA], in violation of 18 U.S.C § 1349 (Count One). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

<u>Elements of the Offenses</u>

      2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>Count One – Conspiracy to Commit Bank Fraud</u>

      a.    The Defendant and at least one other person entered into an unlawful agreement;

      b.    The purpose of the agreement was to knowingly execute or attempt to

1

      execute a scheme or artifice to defraud a financial institution and to obtain money, funds, assets or other property owned by or under the custody or control of a financial institution by means of materially false pretenses, representations, or promises;

c.     The financial institution met the definition of a "financial institution" under 18 U.S.C § 20, including being a mortgage lending business that financed or refinanced debt secured by an interest in real estate and whose activities affected interstate or foreign commerce; and

d.     The Defendant knowingly and willfully became a member of the conspiracy.

### Penalties

3.     The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | 30 years | 5 years | $1,000,000 | $100 |

      a.     Alternative Fine: If any person derived pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the Defendant, the Defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.

      b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.     Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the

United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4.   The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a.   If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b.   If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c.   If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d.   The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e.   If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

  5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

  6.  This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

    a.  The parties agree and stipulate that pursuant to U.S.S.G. § 2B1.1(a)(1) the base offense level for the instant office is seven (7). A twelve-level (12) upward adjustment is warranted pursuant to U.S.S.G. § 2B1.1(b)(1)(G) because the loss of $386,037 involved in the offense was more than $250,000, resulting in an adjusted offense level of nineteen (19).

4

b. The parties also agree and stipulate that pursuant to U.S.S.G. § 3B1.1(c) a two-level (2) upward adjustment is warranted because the Defendant was an organizer, leader, manager, or supervisor of the criminal activity, resulting in an adjusted offense level of twenty-one (21). The Defendant reserves the right to argue against the applicability of this upward adjustment.

c. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

## Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground

whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

    b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      i. The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

      ii. This Office reserves the right to appeal any sentence below a statutory minimum.

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

12. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's loss of $373,684 due and payable at the time of sentencing. The defendant shall make a bona fide effort to pay restitution in full as soon as practicable as determined by the Court and United States Probation. The Defendant agrees that pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant shall be personally, jointly, and severally liable with any codefendants the Court also orders to pay restitution for the full amount of the victim's loss, including Calvin Abramowitz. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Forfeiture

13. The Defendant understands that the Court will enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable

to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses. Specifically, as part of the Order of Forfeiture, the Defendant agrees to the entry of money judgment in the amount of $493,037, which represents the amount of illegal proceeds he received from the scheme to defraud. Payments toward restitution will also count toward any outstanding balance due under the Order of Forfeiture.

14. The Defendant agrees to consent to the entry of orders of forfeiture for the property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

18.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

19.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

*Digitally signed by MARTIN CLARKE*
*Date: 2022.05.04 17:35:12 -04'00'*

Martin J. Clarke
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorneys. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorneys, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorneys.

| | |
|---|---|
| 5/4/2022 | Philip Abramowitz |
| Date | |

8

We are the Defendant's attorneys. We have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises us that the Defendant understands and accepts its terms. To our knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/5/2022
Date

*[signature]*   AJI
A. Jeff Ifrah, Esq.

5/5/2022
Date

*Jim Trusty* JMT
James M. Trusty, Esq.

## Attachment A

**The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.**

### COUNT ONE (Conspiracy to Commit Bank Fraud)

#### a.    Plaza Home Mortgage – 163 N. Potomac Street

The Defendant, Philip Abramowitz, was the sole owner and member of a Maryland company called 163 N. Potomac St., LLC, located at 5906 Park Heights Ave., Baltimore, Maryland. Abramowitz owned a second business called S & D Investments located at the same address.

Abramowitz used his limited liability company, 163 N. Potomac St., LLC, to purchase two houses located on N. Potomac Street in Baltimore City ("Potomac Street Properties"). The first house, located at 163 N. Potomac St., Baltimore, MD, was purchased on or about November 21, 2013, for approximately $41,000 ("163 N. Potomac St."). The second house, located at 146 N. Potomac St., Baltimore, MD, was purchased on or about November 25, 2013, for approximately $55,000 ("146 N. Potomac St."). Both houses were purchased as investments and used as rental properties.

About three years later, in May 2016, Abramowitz decided to sell 163 N. Potomac. Instead of listing the property for sale, Abramowitz entered into an agreement with his brother, Calvin Abramowitz, whereby Calvin Abramowitz would buy the house for $300,000 using an FHA-insured loan. The Federal Housing Administration (FHA) is part of the U.S. Department of Housing and Urban Development (HUD). FHA provides mortgage insurance on loans made by FHA-approved lenders. FHA-insured loans enable first-time home buyers to obtain long-term financing under terms and conditions that would otherwise not be available to them through normal commercial channels.

To qualify for an FHA-insured loans, FHA requires the buyer to use the house as their primary residence. FHA underwriting requirements also require the buyer and seller to disclose and certify any familial or business relationship between them, as well as the source of the money the buyer intends to use for the down payment and closing costs.

Despite being a longtime resident of New Jersey with no plans to make 163 N. Potomac his primary residence, Calvin Abramowitz applied for a $294,566 FHA-insured residential loan through Plaza Home Mortgage, Inc. (Loan No. 244-1235918). Plaza Home Mortgage was a financial institution within the meaning of Title 18, United States Code, Section 20. To facilitate the loan underwriting process and ensure that Calvin Abramowitz qualified for the loan, both he and Philip Abramowitz concealed their fraternal relationship from Plaza Home Mortgage. To that end, they enlisted the assistance of a property manager with the initials Y.E. to pose as the authorized manager of 163 N. Potomac St., LLC. Y.E. signed the contract of sale as the "seller"; attended the real estate settlement on August 2, 2016; and signed the closing documents. Nowhere

is the loan application or closing documents does Philip Abramowitz's name appear as the sole owner, member, and manager of the LLC.

To bolster the false representation that Y.E. was the manager of the LLC and authorized to sell the property, Philip Abramowitz drafted a fraudulent "LLC Resolution" for Y.E.'s signature. The bogus resolution, which was submitted as part of the loan closing process, falsely asserted that as of the day of settlement, Philip Abramowitz's father-in-law, M.N., was the "Sole and Managing Member" of 163 N. Potomac St., LLC, and it bore M.N.'s forged signature. To backstop the bogus resolution, Philip Abramowitz drafted and submitted a fake "Assignment of LLC Interest" that falsely claimed that Abramowitz's father-in-law bought the company for "$9,000" back in 2013. M.N.'s signature on that document was also forged.

To further facilitate the sale of his property, Philip Abramowitz gave Calvin Abramowitz $10,500 to pay the closing costs because Calvin did not have the financial means to make the purchase. Calvin concealed that fact by falsely certifying on his Uniform Residential Loan Application and in closing documents that he had not been paid or reimbursed for the closing costs. To backstop those misrepresentations, Calvin Abramowitz represented the banking activity and account balance in Philip Abramowitz's bank account as his own, *i.e.*, he gave Plaza Home Mortgage three months of Philip Abramowotiz's bank statements (account ending in 8995) that had been altered to make it appear as though the monthly statements were from Calvin Abramowitz's bank account.

Based on the foregoing misrepresentations, Plaza Home Mortgage loaned Calvin Abramowitz $294,566 for the purchase of 163 N. Potomac. The net proceeds from the loan in the amount of $171,661 were deposited into Philip Abramowitz's bank account ending in 8995. In addition to spending the proceeds on personal expenses, Philip Abramowitz gave Calvin Abramowitz's wife a check in the amount of $40,000, which was spent on personal expenses, including mortgage payments on the residence in New Jersey that she jointly owned with Calvin Abramowitz. The property at 163 N. Potomac St. was never used as a primary residence by Calvin Abramowitz. Instead, he rented the property for about a year before he stopped making the mortgage payments and the property went into foreclosure.

b. **Movement Mortgage, LLC – 146 N. Potomac Street**

On March 31, 2017, about three years after Philip Abramowitz purchased the house at 146 N. Potomac St, he decided to sell it for $250,000. As he did with 163 N. Potomac St., he arranged to have a family member buy it to facilitate the sale. This time it was his father, Kalman Abramowitz, who signed the contract of sale and applied for an FHA-insured loan.

Despite having no plans to make 163 N. Potomac his primary residence, Kalman Abramowitz applied for a $245,471 FHA-insured residential loan through Movement Mortgage, LLC (Loan No. 244-1376052). Movement Mortgage was a financial institution within the meaning of Title 18, United States Code, Section 20. To ensure that Kalman Abramowitz qualified for the loan, both he and Philip Abramowitz concealed their fraternal relationship from Movement Mortgage. As he did with 163 N. Potomac St., Philip Abramowitz enlisted the assistance of Y.E., his property manager, to represent the "seller," 163 N. Potomac St., LLC. In so doing, Y.E. signed the contract of sale as the "seller"; attended the real estate settlement on March 31, 2017; and signed the closing documents. Nowhere in the loan application or closing documents does Philip Abramowitz's name appear as the sole owner, member, and manager of the LLC.

In various documents submitted during the application and settlement process, Philip and Kalman Abramowitz falsely represented that Y.E. had become the sole owner and managing member of 163 N. Potomac St., LLC. Philip Abramowitz drafted a fraudulent "LLC Affidavit of Title" for Y.E.'s signature. The bogus affidavit falsely asserted that Y.E. was the "sole member of Seller and no other person or entity has any ownership interest in Seller."

To backstop the bogus affidavit, Philip Abramowitz drafted and signed an "Affidavit" that falsely claimed that on December 14, 2014, he had sold his "One Hundred Percent (100%) membership interest in 163 N. Potomac St., LLC, to [Y.E.]" for $20,000 and the assumption of a $120,000 loan. Philip Abramowitz also signed an "Assignment of LLC Membership Interest" that made the same false claim. In truth and fact, Y.E. never purchased an interest in the LLC.

To further backstop the misrepresentation to Movement Mortgage that Y.E. was the sole owner of 163 N. Potomac St., LLC, Philip Abramowitz created a fake "Amended & Restated Operating Agreement" and "LLC Resolution," both of which bore the forged signature of Y.E. A fake invoice to Y.E. and an altered cashed check, both for $20,000, were also submitted during the settlement process. Y.E.'s signature on the check was forged.

To further facilitate the sale of 146 N. Potomac St., Philip Abramowitz gave Kalman Abramowitz $8,750 to pay the closing costs because Kalman did not have the financial means to make the purchase. Like Calvin Abramowitz did with the purchase of 163 N. Potomac St., Kalman Abramowitz concealed the source of payment for the closing costs by falsely certifying on his Uniform Residential Loan Application and in closing documents that he had not been paid or reimbursed for the closing costs. To backstop those misrepresentations, Kalman Abramowitz represented the banking activity and account balance in Philip Abramowitz's bank account as his own, *i.e.*, he gave Movement Mortgage three months of Philip Abramowitz's bank statements (account ending in 8995) that had been altered to make it appear as though the monthly statements were from Kalman Abramowitz's bank account.

Based on the foregoing misrepresentations, Movement Mortgage loaned Kalman Abramowitz $245,471 for the purchase of 146 N. Potomac St. Most of the net proceeds from the loan in the amount of $98,996 were deposited into Philip Abramowitz's bank account ending in 8995. However, when the bank did not accept one of the wire transfers from the settlement company, Philip Abramowitz had Y.E. open a second bank account in the name of 163 N. Potomac Street, LLC, so the balance of the proceeds from the sale of 146 N. Potomac Street could be wired into that account and then withdrawn via a check payable to Philip Abramowitz.

In addition to spending the loan proceeds on personal expenses, Philip Abramowitz gave Kalman Abramowitz's wife a check in the amount of $8,000. The property at 146 N. Potomac St. was never used as a primary residence by Kalman Abramowitz. In fact, no monthly mortgage payments were ever made to Movement Mortgage, the property fell into disrepair, and went into foreclosure.

---

I have read this Statement of Facts and carefully reviewed every part of it with my attorneys. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

5-4-2022
Date

Philip Abramowitz

We are Philip Abramowitz's attorneys. We have carefully reviewed every part of this Statement of Facts with him. To our knowledge, his decision to sign it is an informed and voluntary one.

5/5/2022
Date

A. Jeff Ifrah, Esq.

5/5/2022
Date

James M. Trusty, Esq.